**Electronically Filed
Supreme Court
SCWC-16-0000386
19-JUN-2020
02:37 PM**

IN THE SUPREME COURT OF THE STATE OF HAWAI'I

---o0o---

STATE OF HAWAI'I,
Respondent/Plaintiff-Appellee,

vs.

CARI SALAVEA also known as CARI CARVEIRO,
Petitioner/Defendant-Appellant.

SCWC-16-0000386

CERTIORARI TO THE INTERMEDIATE COURT OF APPEALS
(CAAP-16-0000386; CR. NO. 15-1-0608)

JUNE 19, 2020

McKENNA, POLLACK, AND WILSON, JJ., WITH NAKAYAMA, J.,
DISSENTING, WITH WHOM RECKTENWALD, C.J., JOINS

OPINION OF THE COURT BY POLLACK, J.

Under article I, section 14 of the Hawai'i Constitution and the Sixth Amendment of the United States Constitution, defendants in criminal cases are provided with the right to the effective assistance of counsel at trial. The defendant in this case contends that she was denied this right because her trial counsel failed to adduce critical evidence impeaching the

credibility of the State's key witness.  Because we conclude that the failure to adduce this evidence had no obvious tactical benefit to the defendant's case and that the adequacy of counsel's representation, when viewed as a whole, was not within the range of competence required of attorneys in criminal cases, we conclude that the defendant was denied the right to the effective assistance of counsel.  We also consider the defendant's contention that prosecutorial misconduct was committed during closing argument to address the Intermediate Court of Appeals' interpretation of applicable precedent and because consideration of this issue further evidences that the assistance of defense counsel was ineffective.

## I.    BACKGROUND AND PROCEDURAL HISTORY

On April 17, 2015, Cari Salavea was charged by felony information with burglary in the first degree, in violation of Hawai'i Revised Statutes (HRS) § 708-810(1)(c).[1]  The felony

---

[1]    HRS § 708-810(1)(c) (2014) provides as follows:

(1) A person commits the offense of burglary in the first degree if the person intentionally enters or remains unlawfully in a building, with intent to commit therein a crime against a person or against property rights, and:

. . . .

(c) The person recklessly disregards a risk that the building is the dwelling of another, and the building is such a dwelling.

information alleged that on or about March 27, 2015, Salavea unlawfully entered the residence of the complaining witness (CW) with the intent to commit a crime therein, thereby violating HRS § 708-810(1)(c). Salavea entered a plea of not guilty, and a jury trial was scheduled for the week of June 22, 2015.[2]

On June 22, 2015, Salavea filed a notice of intent to use evidence (Salavea's Notice) stating that she intended to adduce evidence that the CW was in the process of using methamphetamine in her residence at the time of the alleged burglary. Salavea stated that the CW's drug use undermined the reliability of the CW's perception and memory of the alleged offense. On June 29, 2015, the State moved for a continuance, citing the unavailability of a witness. The court granted the motion over defense objection, and trial was rescheduled for the week of September 8, 2015.

On August 13, 2015, Salavea's counsel, the Office of the Public Defender, moved to withdraw as counsel due to a conflict of interest arising from its ongoing representation of the CW in a separate matter. In a declaration attached to the motion, counsel averred the ethical obligation to raise the CW's substance abuse as a relevant factor in Salavea's case. Counsel

---

[2] The Honorable Karen S. S. Ahn presided over pretrial proceedings, the jury trial, and sentencing.

stated that continued representation of Salavea would compromise the attorney-client relationship between the Office of the Public Defender and the CW. The court granted the motion on August 25, 2015, ordering the appointment of substitute counsel. At a hearing on September 4, 2015, substitute counsel requested a continuance so that counsel could prepare for trial. The State did not object, and trial was rescheduled for the week of November 16, 2015.

On November 13, 2015, the State filed a notice of intent to use evidence of other acts (State's Notice), asserting that the State intended to present evidence of Salavea's admitted gambling problem, her drug use in 2014 and 2015, and the circumstances of a prior theft conviction. The State contended that this evidence was probative of Salavea's motive, opportunity, intent, and lack of mistake, as well as relevant for impeachment purposes.

The State argued that Salavea's gambling was relevant because Salavea and the CW had gambled together in the past, Salavea had asked the CW to lend her money at some time prior to the alleged burglary, and the CW had refused to do so. The State maintained that these facts demonstrated Salavea's motive to commit the burglary. Additionally, the State contended Salavea's prior drug use was relevant because the CW was

4

expected to testify that she had distanced herself from Salavea because the CW felt she was at risk of relapsing while in Salavea's company based on Salavea's drug use and their history of using drugs together, which in turn upset Salavea and provided a motive for the current offense.

The State also moved in limine to exclude, inter alia, evidence of the CW's history of drug use. If Salavea was allowed to inquire about the CW's history of drug use, the State maintained, Salavea would be opening the door to the CW's explanation that she distanced herself from Salavea to avoid relapsing. In response, Salavea filed a motion in limine seeking preclusion of the evidence that was the subject of the State's Notice. Salavea maintained that her gambling and history of drug use during 2014 and 2015 should not be admitted because they were irrelevant.

The hearing on the parties' motions in limine and notices of intent was held on the day trial commenced. The deputy prosecuting attorney (DPA) contended that evidence of prior drug use by either the CW or Salavea was not relevant and should be excluded at trial. The following was stated in regard to the State's motion in limine:

> [DPA]: Judge, if I may elaborate, the reason I put it in here, my position is actually pretty clear-cut. I think any kind of prior drug use or being on [HOPE Probation] or anything like that by either a Complainant or Defendant should not be coming in. The only issue is whether--I

understand they're making allegation whether Complainant was using drugs at the time of the incident, and that's a separate issue.  This is not what's in this.

THE COURT: Okay.  Use of drugs by anybody, whether it be the Defendant or any witness, other witness, I think is legitimate under the case law because it goes to your ability to perceive and recall.  It's up to the jury to decide whether there was an effect or not.

. . . .

THE COURT: And drug use on other occasions is irrelevant.

[DPA]: It's irrelevant, yes.

[DEFENSE COUNSEL]: Yeah, but I mean, when [Salavea] saw--I mean, there were drugs at the scene and activity involving those drugs, so--

. . . .

[DEFENSE COUNSEL]: [I]t ties in with drug use at the occasion, and it ties in beyond just, you know, was her perception failing due to drug use.

THE COURT: Okay.  That will not come up until your case.

[DEFENSE COUNSEL]: Right.

. . . .

THE COURT: It may have to do with the state of mind, right?

[DPA]: Right, memory, perception, state of mind, but not any kind of other drug use or she's known her as a person who used drugs before or this is what she does all the time.  That's what I'm objecting to because it's not relevant.

[DEFENSE COUNSEL]: No, and I agree with the State.  I mean, there's certainly not going to be any attempt to expand beyond what [Salavea] perceived the situation to be in that room, not just, you know, how good [the CW]'s perception was but in terms of were there drugs there, was that girl getting into trouble with drugs, you know, that sort of thing.

. . . .

THE COURT: In Cross, I would think we're limited to the event, the event at issue.

[DPA]: Exactly.

[DEFENSE COUNSEL]: Well, based upon what she says--

[DPA]: She cannot--"Were you using the drugs on March 27th?" and the answer is going to be no, and they have to live with that.

THE COURT: Yeah, until something else comes up, and that would be in the Defense's case.

[DPA]: Defense's side, and when Defense's side comes up, they can rebut the testimony with the perception of what happened in the room, if she had blurry eyes or slurred speech or if she was acting funny, whatever, but they cannot go into past drug use, history of drug use, or any kind of "I know she was using drugs even though she looked normal because she always uses drugs," you know, so I want to make sure that the rebuttal is also limited to perception of what happened in this room.

. . . .

I'd also like to point out . . . there's a portion of why I filed Notice of Intent.  If it does come out and it's pretty much irreparable and the jury here hears Defendant's testimony about any kind of allegations of prior drug use or whatever that goes beyond the scope of that event, State should be allowed to question Defendant and bring it up that they were doing it together over that period of time.

THE COURT: Oh, yeah, it's fair Cross.  Both of you have a right to fair Cross, and credibility is always, obviously, an issue in addition to what happened that night or that day.

[DPA]: I'm sorry.  Not just that day, but if the history of drug use--

THE COURT: I understand what you're saying.  No, you have the right to fair Cross, and [Defense Counsel] has a right to fair Cross.

[DPA]: And this goes to her state of mind.

THE COURT: Okay, I think we've talked about No. 1.  I think we understand where we are.

(Emphases added.)

After ruling on the State's remaining motions in limine, the court considered Salavea's motion to exclude the evidence that was the subject of the State's Notice.  The

7

following exchange took place with regard to Salavea's history of drug use in 2014 and 2015:

> THE COURT: Okay.  Defendant's drug use in 2014 and 2015, is that something you still want at this point?
>
> [DPA]: Well, yes.  If they open the door through bringing up the whole history and everything else[.]

(Emphasis added.)

The court then considered Salavea's Notice.  The court stated that "[Salavea]'s Notice of Intent will be granted, assuming the evidence is that [the CW] . . . was using ice at about 1:30, and that's when this incident occurred, and I'm hearing that from the lawyers.  I guess that comes in to show perception and recall."[3]

At trial, the CW testified that she was living with her parents and her six-year-old daughter in a secured apartment building at the time of the incident.  An electronic fob was needed in order to access the building.  She had lost her original fob in June 2014 but did not know where she lost it.  According to the CW, she reported her fob as lost and had it replaced but did not deactivate the misplaced fob because she thought she might find it at some point.

---

[3]  Crystal methamphetamine is "commonly known as ice" in Hawai'i. H. Stand. Comm. Rep. No. 495-04, in 2004 House Journal, at 1603.

The CW also testified that she and Salavea had been close friends and had known each other for six years. The CW was godmother to one of Salavea's children and had been the maid of honor at her wedding. She and Salavea would meet every once in a while and do family activities together such as taking their kids to the pool. They were very close but did not always spend time together, and she had started spending less time with Salavea at the beginning of 2015. The CW acknowledged that she let Salavea borrow possessions from her in the past, but she stated that Salavea borrowed more from her than she did from Salavea. Prior to March 27, 2015, the last time she had seen Salavea was earlier that month on March 6, when they went gambling together, and they had been out all night.

The CW testified that on the afternoon of March 27, she was at home recovering from a workplace injury to her foot. The CW stated that she was at her residence that day with her parents until they left sometime between 1:15 and 1:30 p.m. She received a call from Salavea around that time but did not answer the phone. She then fell asleep for a while; when she woke up, her phone was missing as were some other possessions, including a tablet and a backpack containing her wallet. The CW called her mother on the landline to see if she had seen her phone, but

her mother said she had not.[4]  She went downstairs to building security and reviewed surveillance footage of the elevators going up to her floor.  The footage showed Salavea entering the building and making her way to the floor on which the CW resided.  It then showed Salavea reentering the elevator and exiting the building carrying the missing backpack.  The CW testified that she had not given Salavea permission to enter her home or to take her backpack.

Ray Pavao, a security guard at the CW's apartment complex, testified that around 7:00 p.m. on March 27, 2015, the CW reported that someone had possibly come into her unit and taken some of her belongings.  He and the CW reviewed the security footage together.  Michael Bryant, a security supervisor at the CW's apartment complex testified that he reviewed the record of fob usage between March 1 and March 31, 2015 on the apartment computer system, and one fob registered to the CW was used only three times, all on the afternoon of March 27, 2015.  Additionally, Bryant stated that the record of fob purchases by residents showed that the CW had purchased another

---

[4]     The CW's mother corroborated this statement in her testimony. The CW's mother also testified that when she returned to the apartment the CW was "speak[ing] okay."

fob on June 27, 2014, but there was no record that a fob assigned to the CW was deactivated.

Salavea testified that she went to the CW's residence on the afternoon of March 27, 2015, because she was returning the CW's house key to her, which she said the CW had left in Salavea's car earlier that month on March 6. Salavea stated that she called the CW around noon on March 27 to tell her that she was in town and was going to stop by to drop off the CW's house key. The CW told her to park in the CW's designated parking stall and come upstairs. Salavea testified that she then went to the CW's apartment where she met and spoke with the CW. After speaking with the CW, she borrowed a pair of slippers and a backpack from her and left the apartment. Salavea identified the backpack that she borrowed as the same backpack shown in the surveillance footage. The following exchange then took place:

> [DEFENSE COUNSEL]: Did anything else occur between the two of you while you were there?
>
> SALAVEA: Can you--what do you mean?
>
> [DEFENSE COUNSEL]: Let me ask you this. How long did you stay there?
>
> SALAVEA: Not long 'cause my friend was in the car waiting.
>
> [DEFENSE COUNSEL]: So did anything else occur before you left? You borrowed her sneakers, her backpack.
>
> SALAVEA: Well, she told me not to take her bag 'cause she was going to use it, so I told her that I wanted to use it

and she can come to my house and get it when she's not out of it.

[DEFENSE COUNSEL]: And did she seem alert on that occasion when you said "when she's not out of it"?

[DPA]: Objection, Your Honor.

[DEFENSE COUNSEL]: I'll rephrase.

[DPA]: And I'm also objecting to the last answer.

THE COURT: To the last answer? There was no answer.

[DPA]: The basis is hearsay.

THE COURT: Oh, to the last answer. All right. Well, it is hearsay. I'll strike that last answer by the witness, and the jury will disregard it.

[DEFENSE COUNSEL]: I'm sorry. The portion that her friend said to her?

THE COURT: This thing about "she didn't want me to use it."

[DPA]: No, the last portion, the last portion of the answer, what Defendant is saying she told her. It's basically self-serving hearsay that is adduced by Defendant--

THE COURT: And I'm striking it as hearsay, the whole answer.

[DPA]: No, only starting with "I told her," so when she was not given permission to use the bag, I'm not asking to strike that.

THE COURT: "She told me," everything after that in the last answer is stricken. Jury will disregard it.

[DEFENSE COUNSEL]: Very well. So on that occasion, did you leave with her backpack?

SALAVEA: Yes.

[DEFENSE COUNSEL]: And you left with her footwear?

SALAVEA: Her slippers.

[DEFENSE COUNSEL]: Where did you go from there?

SALAVEA: We went to Popeye's so my friend could use the bathroom and grab something to eat, and then we went back to the west side, my house.

Defense counsel did not attempt to rephrase the question that drew the State's hearsay objection. At no point did defense counsel inquire, nor did Salavea testify, about whether the CW was using or under the influence of methamphetamine while Salavea was there.

Salavea also testified that she had borrowed backpacks and shoes from the CW in the past. On cross-examination, the DPA questioned Salavea about her intent to return the bag to the CW. Salavea explained that she had asked her husband to return the bag, but he had been unable to contact the CW.[5] The prosecutor then questioned Salavea about her statement that the CW had told her not to borrow the bag because the CW wanted to use it. Specifically, the prosecutor asked if Salavea thought it was "okay" for her to borrow the bag, even though the CW told her not to take it, because she had borrowed items from the CW previously without express permission. Salavea responded that the CW "was there" but acknowledged that it was not okay to take the bag without express permission. After this acknowledgement, the DPA asked Salavea, "So it wasn't okay to take it?" and Salavea responded, "No, it wasn't." The DPA then stated, "So it was a theft?" and Salavea said, "Yeah."

---

[5]    Salavea also testified that she had been unable to return the CW's backpack herself because she was incarcerated, but she had told the police where the CW's backpack was located after she was arrested.

At the conclusion of the evidence, the court instructed the jury on the elements of burglary in the first degree and the included offenses of criminal trespass in the first degree and theft in the fourth degree.

During closing arguments, the DPA made the following statements:

> [DPA]: The Defendant in this case, Cari Salavea, is guilty of Burglary in the First Degree, not just of Trespass or Theft but of Burglary in the First Degree, and the reason why is because she entered unlawfully into [the CW's] house with intent to commit a crime, with intent to steal. [The CW] told you the truth. [The CW]'s testimony was credible.
>
> THE COURT: Well, the State submits.
>
> [DPA]: Thank you. The State submits that [the CW]'s testimony is credible because it is corroborated by other evidence, because it makes sense, and because you, as the judges of everybody's demeanor and looking at those factors that are given to you in the jury instructions, can assess for yourself whether it makes sense or not.
>
> . . . .
>
> Defendant's story that she had permission to go in and she had somehow thought it was okay and that [the CW] cooperated with her and [the CW] let her do all of that is not credible. It's not credible, it's a lie, because it doesn't make any sense.
>
> [W]hat you need to focus on and this is how the State submits to you that it's proven that Defendant's story doesn't add up--is the whole story by Defendant that the fob was lost by [the CW] on March 6th does not hold, does not hold up. That's a lie, and from there, it follows that she was concealing the fob, she was deliberately holding on to that fob secretly so she could go in her own time at her own convenience and take from [the CW].
>
> [The CW] told you and she was very frank with you, she explained in details what happened to her fob. She told you she lost that fob as far as almost a year prior to this incident in March, and that testimony was corroborated by Ray Pavao. That testimony was corroborated by the records that she got an additional fob, she got the second fob.

14

. . . .

What does that mean?  That shows you that [the CW] told you the truth.  She told you she lost the fob and she got one on June 27th.  The records show that she got her replacement fob on June 27th.  That directly contradicts Defendant's story that [the CW] lost it in the car, and from there, everything crumbles, everything the Defendant tells you is not true.

. . . .

So, ladies and gentlemen, for these reasons, State submits to you that Defendant is guilty as charged of Burglary in the First Degree, not just of Trespass or Theft.  It's a Burglary in the First Degree because Defendant, by lying about how the fob situation went up, she concealed that fob, she went there specifically with an intent to commit the crime because she have both motive and opportunity.

(Emphases added.)

During the defense's closing argument, defense counsel made the following statements:

[DEFENSE COUNSEL]: If I may leave you with a suggestion of evaluating the evidence in this case, it would be this. You recall that just before our lunch break, [Salavea] went on the witness stand, and the Deputy Prosecutor asked her whether she didn't take the Roxy bag without permission and whether that wasn't indeed theft, and [Salavea] broke down, she was in tears, and that's, I suggest--

[DPA]: Objection, Your Honor.  This is not in evidence, and it's personal statement.

THE COURT: Overruled.

[DEFENSE COUNSEL]: And that's because it probably didn't even occur to her that that playful little act might be viewed by the law as a theft.  Now, the Government would have you believe that [Salavea], being that type of person, would take all of her friend's valuables, and it's just not borne out by the evidence.  Something occurred between these two women, but it wasn't a burglary.

Then, during rebuttal, the State made the following statements:

[DPA]: Ladies and gentlemen, what Defense Counsel was just doing was trying to appeal to your sense of pity or some

kind of sense, you know, for Defendant, and that's improper. You are given an instruction that you should not be influenced by that.

. . . .

Now, if you look at who is more likely to cook up a story, that was a good suggestion, and State submits to you that one of the guiding, multiple guiding factors are on page 8 of your jury instructions where Judge Ahn did read to you the multiple factors that you may consider in determining whether a person is telling the truth or not.

One of them is the witness' manner of testifying. That is significant. You saw how [the CW] testified. I don't know if calling her sophisticated is kind of an overstatement. That's your judgment entirely. She may not have looked as sophisticated as [Defense Counsel] is claiming, but she was very forthright, she was very forthright about how she felt.

And she also told you frankly that they were close friends. She was disappointed with how their relationship went, but she also did express no bias or no reason or no negativity towards Defendant even though I asked her hard questions. I was kind of asking her, you know, like, how did you feel, what was your, you know, what was your feeling towards relapsing, gambling every time you met with Defendant. She was very, she was very mild as far as when--

THE COURT: The State submits. The State submits.

[DPA]: State submits her testimony was not in any way showing any animosity. If anything, she felt betrayed and disappointed. She had nothing against Cari. Even after this incident, she did not--she has no claim that there was some kind of reason for her to feel specific animosity towards her friend. She was also very frank and forthright how she described what happened to her when she discovered things were missing. She told you in details how she was trying to call her phone, and it went to ringing first, then voicemail.

. . . .

But why would she go to Ray and look at that video to try to figure it out if in fact it happened the way Cari says it happened? Cari Salavea is not a truthful witness.

Another factor is interest, if any, in the result of this case. Of course, every Defendant has a lot of interest in the result of the case, and that's natural, but you cannot disregard it. It's still there. There is interest and bias. Defendant has a lot of interest what's at stake, while [the CW], why would [the CW] go through all of this

16

and why would [the CW] go and make up a story if it was not what happened?  There was no evidence by Defendant why is it that [the CW] would do it, and there was no evidence from [the CW], even though we pushed her, both of us, that she had any reason to tell this story.  She told you the truth.

THE COURT: Well, the State submits.

[DPA]: State submits she told you the truth.

THE COURT: Strike that "She told you the truth."  What is your argument?  Jury will disregard that part of the argument.

[DPA]: Okay.

(Emphases added.)

The jury found Salavea guilty of burglary in the first degree.  On April 19, 2016, the circuit court sentenced Salavea to ten years of imprisonment, with a mandatory minimum term of four years and six months (amended judgment).  Salavea timely appealed from the amended judgment to the Intermediate Court of Appeals (ICA).[6]

On appeal, Salavea contended that her conviction should be vacated or reversed because (1) defense counsel was ineffective for failing to adduce the evidence of the CW's drug use at the time of the incident; (2) the DPA committed prosecutorial misconduct during closing argument; and (3) the State's evidence was insufficient to support her conviction.  In regard to her second point of error, Salavea argued that the DPA

--------

[6]    Salavea's counsel on appeal was not counsel at trial.

17

committed misconduct by offering a personal opinion about Salavea's credibility and the credibility of the State's witnesses, personally attacking defense counsel and accusing counsel of misconduct, and implying that Salavea was obligated to adduce evidence undermining the CW's credibility, thereby improperly shifting the burden of proof to the defense.

## II.    ICA PROCEEDINGS

The ICA first considered Salavea's contention that the assistance of counsel at trial was ineffective.[7]  The ICA found that defense counsel's failure to adduce evidence of the CW's use of methamphetamine at the time of the alleged crime was a deliberate tactical decision.  Citing the motions in limine hearing, the ICA determined that any allegations about the CW's prior drug use would have opened the door to evidence about Salavea's history of drug use.  On this basis, the ICA concluded defense counsel chose not to adduce the evidence of the CW's drug use at the time of the incident in order to avoid the introduction of evidence of Salavea's history of drug use.

The ICA then considered Salavea's contention that several statements made by the DPA during closing argument

---

[7]     The ICA's memorandum opinion can be found at State v. Salavea, No. CAAP-16-0000386, 2019 WL 763475 (App. Feb. 4, 2019) (mem.).

18

constituted prosecutorial misconduct.[8]  Although the DPA had

characterized the CW's testimony as the truth and Salavea's

testimony as a lie, the ICA observed that the DPA described in

detail how the evidence adduced at trial made the CW's testimony

more credible than that of Salavea.  In addition, the ICA stated

that the "Circuit Court gave numerous prompt curative

instructions ('the State submits'), struck the DPA's statement

that 'She told you the truth' and instructed the jury to

'disregard that part of the argument.'"  The ICA also noted that

the jury instructions informed the jury that the lawyers'

statements or arguments were not evidence.  Finally, the ICA

concluded that the use of the word "lie" by the DPA during

closing argument was not misconduct at the time of trial, as

State v. Austin, 143 Hawai'i 18, 422 P.3d 18 (2018), was decided

after the trial in this case and had created a new rule, and

therefore it should be given only prospective application.[9]

        Second, the ICA reviewed Salavea's contention that the

DPA improperly shifted the burden of proof by arguing there "was

---

        [8]     Although Salavea's counsel failed to object to the DPA's
statements at trial, the ICA reviewed the allegations of prosecutorial
misconduct under the plain error doctrine.

        [9]     In Austin, this court held that prosecutors were prohibited from
using the word "lie" or its derivatives when discussing the credibility of a
defendant or witness's testimony during closing argument.  Austin, 143 Hawai'i
at 56, 422 P.3d at 56.

19

no evidence by Defendant why is it that [the CW] would [tell this story]." The ICA concluded that the DPA had not improperly shifted the burden of proof but merely argued that the CW's credibility had not been impeached by any evidence of bias or motive for untruthfulness. Further, the ICA stated, the jury instructions informed the jury that Salavea had no duty or obligation to call any witnesses or produce any evidence.

Third, the ICA considered whether it was improper for the DPA to argue that Salavea had lied simply because she was the defendant in a criminal case. The ICA acknowledged that this court, in State v. Basham, had found that it is improper for a prosecutor in summation to make generic arguments regarding credibility based solely upon the status of a defendant. (Citing State v. Basham, 132 Hawai'i 97, 319 P.3d 1105 (2014)). The ICA found that the DPA in this case did not violate the holding in Basham because the DPA "did not make a generic tailoring argument" and the comments were harmless beyond a reasonable doubt because the DPA also described how the evidence adduced at trial made the CW's testimony more credible than that of Salavea.

Lastly, the ICA addressed Salavea's contention that the DPA committed misconduct by accusing defense counsel of improperly influencing the jury during closing argument. The

ICA concluded that the DPA was merely reminding the jury about the court's instruction that it should not allow pity for the defendant or prejudice against the defendant to influence its determination in response to what could reasonably have been interpreted as defense counsel's attempt to have the jury take pity on Salavea. Thus, the ICA held that the DPA's comments about defense counsel's conduct were proper.[10]

The ICA accordingly affirmed the circuit court's judgment.

### III. STANDARDS OF REVIEW

#### A. Ineffective Assistance of Counsel

When a defendant first raises the issue of ineffective assistance of counsel on direct appeal, the appellate court may consider the merits of the appeal de novo if the record is "sufficiently developed to determine whether there has been ineffective assistance of counsel[.]" State v. Silva, 75 Haw. 419, 439, 864 P.2d 583, 592 (1993).

#### B. Prosecutorial Misconduct

A defendant's contention on direct appeal that prosecutorial misconduct resulted in the denial of the defendant's right to a fair trial is a question of

---

[10] The ICA also considered and rejected Salavea's contention that the evidence adduced at trial was insufficient to support her conviction.

constitutional law, which we review de novo.  State v.

Underwood, 142 Hawai'i 317, 325, 418 P.3d 658, 666 (2018).

### C.    Sufficiency of the Evidence

In reviewing a challenge to the sufficiency of the

evidence, evidence adduced in the trial court must be considered

in the strongest light for the prosecution.  State v. Kalaola,

124 Hawai'i 43, 49, 237 P.3d 1109, 1115 (2010).  "The test on

appeal is not whether guilt is established beyond a reasonable

doubt, but whether there was substantial evidence to support the

conclusion of the trier of fact."  Id. (quoting State v. Richie,

88 Hawai'i 19, 33, 960 P.2d 1227, 1241 (1997)).

### IV.    DISCUSSION

### A.   The Assistance of Salavea's Trial Counsel Was Ineffective.

Article I, section 14 of the Hawai'i Constitution and

the Sixth Amendment to the United States Constitution provide

defendants in a criminal proceeding with the right to the

effective assistance of counsel at every critical stage of the

prosecution.  State v. Pitts, 131 Hawai'i 537, 541, 319 P.3d 456,

460 (2014).  Violation of an accused's constitutional right to

effective assistance of counsel warrants the irrebuttable

presumption of prejudice.  State v. Antone, 62 Haw. 346, 349,

615 P.2d 101, 105 (1980).  A conviction will be vacated,

therefore, if the defendant was denied effective assistance of

counsel at trial.  State v. Aplaca, 74 Haw. 54, 73, 837 P.2d 1298, 1308 (1992).

The standard for determining the adequacy of counsel's representation is whether, when viewed as a whole, the assistance provided is "within the range of competence demanded of attorneys in criminal cases."  State v. Cordeiro, 99 Hawai'i 390, 405, 56 P.3d 692, 707 (2002).  First, a defendant must show that there were specific errors or omissions reflecting counsel's lack of skill, judgment, or diligence.  Antone, 62 Haw. at 348, 615 P.2d at 104.  Second, the defendant must establish that these errors or omissions resulted in either the withdrawal or substantial impairment of a potentially meritorious defense.  Id. at 348-49, 615 P.2d at 104; State v. DeLeon, 131 Hawai'i 463, 478-79, 319 P.3d 382, 397-98 (2014).

The second prong of this test is satisfied if the defendant shows a possible impairment of a potentially meritorious defense.  DeLeon, 131 Hawai'i at 479, 319 P.3d at 398.  The defendant does not need to show the impairment was probable nor prove that the defendant suffered actual prejudice.  Id.; Briones v. State, 74 Haw. 442, 465, 848 P.2d 966, 977 (1993).  Specific actions or omissions that are alleged to be erroneous but that had an obvious tactical basis for benefitting the defendant's case will not be subject to further scrutiny.

23

State v. Pacheco, 96 Hawai'i 83, 93, 26 P.3d 572, 582 (2001).[11]
If, however, the alleged error or omission had no obvious basis
for benefitting the case and resulted in the withdrawal or
impairment of a potentially meritorious defense, then the
assistance of defendant's counsel was constitutionally
inadequate. State v. Smith, 68 Haw. 304, 309-11, 712 P.2d 496,
500-01 (1986).

Salavea alleges that the assistance of her appointed
trial counsel was ineffective because counsel failed to adduce
evidence of the CW's drug use at the time of the alleged crime.
Before trial, Salavea's counsel had filed a notice of intent
stating that the defense would adduce evidence at trial that the
CW was in the process of using methamphetamine at the time of
the alleged offense. Salavea's Notice indicated that the CW's
drug use was relevant because it undermined the reliability of
her perception and memory of the event. Additionally, at the
pretrial hearing held on the day trial commenced, defense
counsel indicated an intention to adduce evidence of the CW's
drug use at the time of the incident.

---

[11]     It is noted, however, that where "trial counsel makes a critical
tactical decision which would not be made by diligent, ordinarily prudent
lawyers in criminal cases, the right to effective assistance of counsel may
be denied." Antone, 62 Haw. at 352, 615 P.2d at 106.

At trial, during her direct examination, Salavea testified to her account of what transpired at the CW's residence on the day of the incident. As she finished explaining what occurred in the CW's apartment, defense counsel asked Salavea whether "anything else occurr[ed] before you left?" Salavea responded that "she told me not to take her bag 'cause she was going to use it, so I told her that I wanted to use it and she can come to my house and get it <u>when she's not out of it</u>." (Emphasis added.) Defense counsel then asked Salavea "did she seem alert on that occasion when you said 'when she's not out of it?'"

This question drew an objection from the DPA, who stated the objection was based on hearsay and was directed to both the question and Salavea's last answer. The court sustained the State's objection and struck everything after "she told me" in Salavea's previous answer.[12] Defense counsel did not repeat the question about whether the CW seemed alert on that occasion or ask Salavea to explain what she meant by "when she's not out of it," nor did counsel make any other attempts to

---

[12] The full stricken statement was as follows: "Well, she told me not to take her bag 'cause she was going to use it, so I told her that I wanted to use it and she can come to my house and get it when she's not out of it."

elicit evidence that the CW was using or under the influence of methamphetamine at the time of the incident.

It is clear that defense counsel was pursuing elicitation of the CW's use of methamphetamine during the incident but appears to have been confounded by the State's hearsay objection. Defense counsel did not then rephrase the question in a way that would not elicit hearsay and entirely dropped this line of inquiry. The evidence of the CW's use of methamphetamine at the time of the incident, however, clearly could have been elicited without the use of hearsay by simply asking Salavea to state what she saw in the immediate area of the CW, to describe the CW's appearance and physical actions, and to recount whether the CW was able to converse or think coherently. None of these questions were asked. The ability to ask basic questions of this nature is obviously "within the range of competence demanded of attorneys in criminal cases."[13] Cordeiro, 99 Hawaiʻi at 405, 56 P.3d at 707.

---

[13] We also note that although the court sustained the DPA's objection on the basis of hearsay, the statements made by the CW and Salavea regarding the taking of the bag were not hearsay because they had independent legal significance. State v. Villena, 140 Hawaiʻi 370, 378, 400 P.3d 571, 579 (2017) ("It is well-settled that statements of independent legal significance are not hearsay."). The statements were directly relevant to whether Salavea believed that she had permission to take the bag, and therefore they had legal significance independent from the truth of the matter asserted. See Island Directory Co. v. Iva's Kinimaka Enters., Inc., 10 Haw. App. 15, 21-22, 859 P.2d 935, 939 (1993) (holding that statements that constitute the offer, acceptance, or terms of a contract are not hearsay because the making of such

(continued. . .)

26

In its review of Salavea's contention that her counsel provided ineffective assistance, the ICA concluded that defense counsel made a strategic decision not to inquire about the CW's drug use at the time of the incident to avoid opening the door to evidence of Salavea's past drug use.  The dissent similarly concludes that evidence of the CW's drug use at the time of the incident would have opened the door to Salavea's history of drug use.  Dissent at 26.  The "opening the door" doctrine, which has never been adopted in this jurisdiction, provides that when one party introduces inadmissible evidence, the opposing party may respond by introducing inadmissible evidence on the same issue. State v. Lavoie, 145 Hawaiʻi 409, 422-24, 453 P.3d 229, 242-44 (2019).  Here, the circuit court had ruled that evidence of drug use at the time of the incident, by either party, was admissible.  Thus, evidence of drug use at the time of the incident could not have opened the door to evidence of either party's history of drug use.[14]  See State v. Fukusaku, 85 Hawaiʻi

---

(. . .continued)

statements are in themselves relevant).  Counsel's failure to appropriately respond to the DPA's objection regarding this critical verbal exchange between the CW and Salavea further demonstrates that the legal assistance provided by defense counsel was not within the range of competence required of attorneys in criminal cases.

[14]     Because evidence of drug use at the time of the incident was admissible, like the evidence discussed in Lavoie and Fukusaku, the "opening the door" doctrine was never applicable to this case.  Accordingly, for the

(continued. . .)

462, 497, 946 P.2d 32, 67 (1997) ("[E]ven if we were to adopt the doctrine of curative admissibility, it would not be applicable to the present case."). As the State maintained at the pretrial hearing, "whether [the CW] was using drugs at the time of the incident [is] a separate issue" from the CW's and Salavea's past drug use.[15]

The dissent also theorizes that counsel made a tactical decision to terminate the inquiry into the CW's drug use at the time of the incident because counsel determined that the evidence had "negligible value" and was "not worth the risk." Dissent at 27. This is refuted by Salavea's Notice, defense counsel's representation on the day of trial that counsel would adduce the evidence of drug use at the time of the incident, counsel's actual attempt to adduce the evidence that drew the State's hearsay objection, and the universal recognition of the importance of such evidence. See Addison M.

_____

(. . .continued)

same reasons stated in Lavoie, this case does not require us to consider whether the doctrine should be adopted in this jurisdiction. Lavoie, 145 Hawaiʻi at 424 n. 29, 453 P.3d at 244 n.29.

[15]     The dissent describes the State's Notice as being a response to Salavea's Notice, implying the notices were filed contemporaneously. Dissent at 25 ("When Salavea noticed her intention . . . the State filed a Notice[.]"). Salavea's Notice was filed on June 22, 2015, and the State's Notice was filed over four months later on November 13, 2015. Indeed, the DPA stated that the issue of drug use at the time of the incident was "a separate issue" from the evidence identified in the State's Notice and represented to the court that drug use at the time of the incident was not the subject of the State's Notice.

Bowman, Hawaii Rules of Evidence Manual § 611-2[4][B], at 6-75 (2018-2019 ed.) ("Ability to perceive and remember a relevant event are the ingredients of a witness' personal knowledge, which is the basic condition of testimonial competency."). Indeed, Salavea's prior counsel, the Office of the Public Defender, considered the CW's substance abuse so significant to Salavea's defense that counsel's declaration to the court stated that counsel was ethically obligated to raise the evidence during the trial. This ethical obligation required the public defender's office to withdraw as Salavea's counsel because of its ongoing representation of the CW in another matter.

Moreover, Salavea was entitled to cross-examine the CW as to her use of drugs at or near the time of the incident to the extent that it affected her ability to accurately perceive or recall what had occurred. State v. Calara, 132 Hawai'i 391, 402, 322 P.3d 931, 942 (2014) ("[A] defendant is entitled to cross-examine a witness concerning the witness's drug use and addiction at or near the time of the incident to the extent that it affected [the witness's] perception or recollection of the alleged event[.]" (second alteration in original) (internal quotation marks omitted)); State v. Sabog, 108 Hawai'i 102, 111, 117 P.3d 834, 843 (App. 2005) ("For purposes of discrediting a witness, drug-use evidence is admissible to the extent it shows

the witness was under the influence of drugs at the time of the occurrence as to which the witness testifies[.]" (quoting State v. Osby, 793 P.2d 243, 247 (Kan. 1990))).

The dissent further argues that defense counsel made a tactical decision to terminate the inquiry because counsel was unable to complete it without eliciting testimony about prior drug use. Dissent at 27-28. This inability is precisely what illustrates the ineffectiveness of Salavea's trial counsel. As with the elicited "hearsay," counsel could have asked simple questions about what Salavea observed in the CW's immediate area, the CW's appearance and physical actions, and whether the CW was able to converse or think coherently. Such testimony would not have opened the door to Salavea's prior drug use. It is self-evident that the ability to ask basic questions of this nature is "within the range of competence demanded of attorneys in criminal cases." Cordeiro, 99 Hawai'i at 405, 56 P.3d at 707. Thus, contrary to the conclusions of the ICA and the dissent, counsel's failure to adduce the evidence of drug use was not a strategic decision because it did not have any tactical basis for benefitting Salavea's case.[16] Smith, 68 Haw. at 309-11, 712

_____

[16] The dissent makes the strained and incongruous contention that defense counsel's failure to adduce evidence of drug use at the time of the incident in fact benefitted Salavea's defense because Salavea's testimony would have been "in complete contradiction to the testimony of several

(continued. . .)

30

P.2d at 500-01 (concluding that defense counsel's questioning did not have an obvious basis for benefitting the defendant's case).

In order for the assistance of counsel to be constitutionally inadequate, the omission or error must result in the substantial impairment or withdrawal of a potentially meritorious defense. Aplaca, 74 Haw. at 67, 837 P.2d at 1305. In Aplaca, we considered whether defense counsel's failure to investigate potential witnesses was an omission that reflected counsel's lack of skill, judgment, or diligence and whether the omission substantially impaired a potentially meritorious defense. Id. at 66-68, 837 P.2d at 1305-06. In concluding that counsel's omission did have this result, we highlighted the fact that the outcome of the case depended on the credibility of the defendant and the complaining witness. Id. at 72, 837 P.2d at

_____

(. . .continued)

witnesses." Dissent at 26. The dissent points to the CW's mother's statement that the CW was "speak[ing] okay" when she returned to the apartment and Pavao's statement that the CW "looked normal" when the CW reported the incident around 7:00 p.m. that evening. Dissent at 26-27. Apparently, according to the dissent, a single statement that someone is "speaking okay" refutes methamphetamine use or being under its influence during the incident, as does Pavao's observation that the CW "looked normal" several hours later. The dissent's pure speculation provides no basis to conclude that defense counsel's failure to adduce this evidence provided any tactical benefit to the defense, let alone a benefit that is so obvious that it precludes our review of this alleged error, which is what our law requires. Briones, 74 Haw. at 462-63, 848 P.2d at 976 ("[A]ctions or omissions alleged to be error but which had an obvious tactical basis for benefitting the defendant's case will not be subject to further scrutiny." (emphasis added and omitted)).

1308. We noted that "if trial counsel had reviewed the subpoenaed materials and interviewed witnesses . . . he could have produced testimony that would have indicated that [the complaining witness] was not a truthful person." Id. at 73, 837 P.2d at 1308. Although the exact effect of the prospective witnesses on the trial court's assessment of the complaining witness and the defendant's credibility could not be predicted, this court stated in its decision that "we firmly believe that such testimony could have had a direct bearing on the ultimate outcome of the case." Id. The Aplaca court thus concluded that trial counsel's error resulted in the substantial impairment of a potentially meritorious defense and the denial of the defendant's right to the effective assistance of counsel.[17] Id.; accord State v. Silva, 75 Haw. 419, 442-43, 864 P.2d 583, 594 (1993) (holding that the failure to subpoena a witness that "could have significantly bolstered Silva's version of the incident" resulted in substantial impairment of defense); State v. Wakisaka, 102 Hawai'i 504, 517, 78 P.3d 317, 330 (2003)

---

[17] The dissent argues that the holding in Aplaca is inapposite because other evidence adduced at trial corroborated components of the CW's testimony. Dissent at 30-31. However, none of the other evidence went to the critical issues in this case: what transpired in the apartment and Salavea's subjective intent with regard to the backpack. Indeed, the dissent acknowledges that the primary issue was "Salavea's own subjective intent." Dissent at 29-30.

(determining that defense counsel's line of questioning would not have benefitted the defense and that it reflected a lack of skill or judgment).

In this case, Salavea's defense depended on the credibility of Salavea and the CW. Only Salavea and the CW testified to what occurred in the CW's apartment. The testimony of the other witnesses called by the State was primarily used to corroborate other aspects of the CW's testimony. Additionally, defense counsel's error was a failure to adduce evidence that the CW was using methamphetamine at the time when the offense allegedly occurred, which certainly may have significantly affected the reliability of the CW's account. Calara, 132 Hawai'i at 402, 322 P.3d at 942 (holding that drug use and addiction at or near the time of the incident is admissible to impeach the witness's perception or recollection of events); see also Sabog, 108 Hawai'i at 111, 117 P.3d at 843.

The dissent contends that the CW's credibility was immaterial to the jury's verdict because Salavea's own evidence "incriminated her." Dissent at 31. This is incorrect. Salavea testified that she only intended to borrow the CW's property, and although she knew the CW had told her not to take the backpack, she believed that it was permissible for her to borrow

33

it because this type of borrowing was within the norms of their friendship.

In support of the assertion that the CW's testimony was immaterial to the jury's determination, the dissent misconstrues Salavea's testimony at trial to reach the conclusion that Salavea effectively confessed to the crime on the stand. Dissent at 29. The dissent cites the exchange during Salavea's cross-examination in which the prosecutor questioned Salavea about her intent to return the bag. Dissent at 29 n.7. During that exchange, the DPA asked Salavea about her statement that the CW had told her not to take the bag, and Salavea explained that they were mutual friends and had exchanged items in the past. The DPA asked Salavea whether she thought it was okay to take the bag, even though the CW had told her not to, because Salavea had taken items from the CW without permission in the past.[18] Salavea responded that the CW was there at her apartment when she borrowed the bag, clearly implying that the CW would have spoken up if Salavea's borrowing of the backpack were not permitted. The DPA then asked Salavea whether it was okay to take the bag without permission, and

---

[18] The DPA's question misstated Salavea's prior testimony. Salavea had testified on direct examination that she had once borrowed a backpack from the CW's residence after she called the CW and received permission.

Salavea acknowledged that it was not okay to take the bag after the CW told her that she wanted to use it. The DPA asked Salavea, "So it was a theft?" and Salavea said, "Yeah."

Salavea's agreement on cross-examination with the prosecutor's formulation of "theft" is plainly not a confession to the felony offense of burglary in the first degree or the crime of theft. Salavea's acknowledgement during cross-examination that it was wrong to take the CW's backpack without express permission is consistent with her testimony that she believed it was permissible at the time of the incident.[19] Moreover, the dissent's contention disregards Salavea's testimony that she intended only to borrow the bag. See State v. Kahinu, 53 Haw. 646, 648, 500 P.2d 747, 750 (1972) (vacating the defendant's burglary conviction because the evidence did not establish "the requisite element of intent to commit larceny or any felony" as a matter of law (emphasis added)).

Salavea and the CW had been close friends for six years to the extent the CW was the godmother to one of Salavea's

---

[19] The dissent's conclusion that the CW's testimony was immaterial relies on the assertion that Salavea testified that she knew "on the day of the incident" that it was wrong to take the bag and that it "amounted to theft." Dissent at 29. As discussed, in light of the entirety of Salavea's testimony, the jury could have found that a reasonable doubt existed as to whether Salavea had the subjective intent to steal the CW's property at the time it was taken, despite Salavea's response to the DPA's formulation.

children and she had been the maid of honor at Salavea's wedding. Both the CW and Salavea testified that they occasionally exchanged items or borrowed from one another. Salavea's adoption of the DPA's formulation of "theft" did not prevent the jury from concluding that there was reasonable doubt as to whether Salavea subjectively intended to steal the CW's property, even though she admitted that she took the backpack without express permission.[20] There was substantial evidence before the jury about the nature of their relationship and their history of exchanging personal possessions. The evidence before the jury permitted the inference that Salavea did not intend to steal the backpack at the time she took it and that she intended to return it. The dissent's assertion that Salavea's own testimony incriminated her to such a degree that the CW's

_____

[20] The dissent's contention demonstrates why attorneys are prohibited from eliciting legal conclusions from witnesses. See Samson v. Nahulu, 136 Hawai‘i 415, 429, 363 P.3d 263, 277 (2015) (citing HRE Rule 704 and stating that a witness may not give opinions on questions of law as that would amount to legal conclusions). It is incorrect for the dissent to assert that Salavea admitted that she had the subjective intent requisite to theft, a legal conclusion, solely because Salavea, a layperson, accepted the DPA's assertion that taking property without express permission is "theft." Dissent at 43. Salavea's acceptance of the DPA's proffered definition of "theft" was not an admission that she had the subjective intent requisite to the actual crime of theft.

testimony was immaterial to the jury's determination is without merit.[21]

Unquestionably, the most critical evidence in this case contradicting Salavea's account of the incident was the testimony of the CW. If defense counsel had adduced evidence that caused the jury doubt or hesitancy regarding the CW's perception or recollection of the incident, the jury may have discredited the CW's account. This evidence went to the heart of Salavea's defense, which turned on the credibility of the CW's or Salavea's version of the events. Ultimately, as in Aplaca, "the outcome of the case depended on the credibility" of the CW and Salavea. 74 Haw. at 72, 837 P.2d at 1308; accord Silva, 75 Haw. at 442-43, 864 P.2d at 594.

Because the CW's testimony was critical to the State's case, we are left with the firm belief that the failure of Salavea's counsel to elicit testimony that the CW was using or under the influence of methamphetamine at the time of the alleged offense resulted in the possible impairment or withdrawal of a potentially meritorious defense. Wakisaka, 102 Hawai'i at 516, 78 P.3d at 329 ("[Defendant] need only show a possible impairment of a potentially meritorious defense, not

_____

[21] It is also noted that the State's closing argument focused on the credibility of the competing narratives of the incident, and the DPA repeatedly argued that the CW's testimony was more credible than Salavea's.

37

probable impairment or actual prejudice."). Defense counsel's failure to adduce the evidence of the CW's drug use at the time of the incident did not have an obvious tactical basis for benefitting Salavea's case. This error demonstrated counsel's lack of skill and judgment, and it resulted in the possible impairment of a potentially meritorious defense. Counsel's representation, when viewed as a whole, was not within the range of competence "demanded of attorneys in criminal cases," and thus Salavea was denied her right to the effective assistance of counsel.[22] Cordeiro, 99 Hawaiʻi at 405, 56 P.3d at 707.

---

[22] The dissent appears to contend that a single "failure to adduce testimony at trial" can never render counsel's assistance ineffective. Dissent at 37. The relevant inquiry is not the number of errors defense counsel makes, but whether counsel's error possibly impaired a potentially meritorious defense. This court held in Aplaca that counsel's failure to investigate potential witnesses and review discovery materials prevented relevant impeachment testimony from being adduced at trial, which possibly impaired a potentially meritorious defense, and we therefore concluded that counsel's assistance was ineffective. 74 Haw. at 72-73, 837 P.2d at 1307-08. This court further held that defense counsel made an error that reflected counsel's lack of skill and judgment specifically because of a failure to overcome an objection to testimony at trial. Id. at 71-72, 837 P.2d at 1307 ("[W]hen Aplaca's trial counsel called Captain Watkins as a witness, the State objected and requested an offer of proof. Trial counsel's failure to make an offer of proof further demonstrated his lack of skill and judgment." (emphasis added)).

Here, defense counsel's failure to adduce the evidence impeaching the CW's credibility had no tactical basis for benefitting Salavea's defense, let alone an obvious one. Just as the defense attorney's failure in Aplaca to make an offer of proof had no tactical basis, here defense counsel's failure to overcome the hearsay objection was obviously not a tactical decision, it provided no tactical benefit to Salavea's defense, and it possibly impaired a potentially meritorious defense.

**B.    Salavea's Allegations of Prosecutorial Misconduct.**

Salavea also contends that the prosecutor made multiple statements during closing argument that constituted prosecutorial misconduct.  None of these statements were objected to by the defense, although the circuit court sua sponte interjected in several instances.  In State v. Smith, after concluding that there were errors reflecting defense counsel's lack of skill or judgment and that the errors substantially impaired a potential meritorious defense, we stated "there [was] more in the record to support the claim that counsel's performance at trial was not within the range of competence expected of Hawaii lawyers in criminal cases."  68 Haw. at 312-13, 712 P.2d at 502.  Similarly, our review in this case of the contentions of prosecutorial misconduct, which were not subject to objection, bolsters the conclusion that the assistance provided by Salavea's trial counsel, when viewed as a whole, was not within the range of competence demanded of attorneys in criminal cases.  Cordeiro, 99 Hawai'i at 405, 56 P.3d at 707.  Additionally, we consider the assertions of prosecutorial misconduct to address the ICA's interpretation of applicable precedent and to provide guidance in the event these matters arise during subsequent proceedings.  State v. Basham, 132 Hawai'i 97, 112, 319 P.3d 1105, 1120 (2014) ("In order to

39

provide guidance to the circuit court and the parties on remand, we address Basham's remaining claims of prosecutorial misconduct."); Wakisaka, 102 Hawai'i at 518, 78 P.3d at 331 ("Although the [determination of prosecutorial misconduct and ineffective assistance of counsel] are dispositive of this case, we address the court's exclusion of much of [the expert's] proffered testimony in order to provide some guidance on retrial.").

When reviewing allegations of prosecutorial misconduct, the following factors are considered: (1) the nature of the conduct; (2) the promptness of a curative instruction; and (3) the strength or weakness of the evidence against the defendant. State v. Rogan, 91 Hawai'i 405, 412, 984 P.2d 1231, 1238 (1999). Salavea submits that there are four separate bases to conclude that the State committed prosecutorial misconduct during closing argument.

### 1. Expression of Personal Opinion

Salavea contends that the prosecuting attorney improperly offered a personal opinion that the CW was a credible witness and that Salavea was not credible. During closing argument, a prosecutor is permitted to draw reasonable inferences from the evidence and wide latitude is allowed in discussing the evidence. State v. Underwood, 142 Hawai'i 317,

326, 418 P.3d 658, 667 (2018). But it is "well-established under Hawai'i case law that prosecutors are bound to refrain from expressing their personal views as to a defendant's guilt or the credibility of witnesses." Basham, 132 Hawai'i at 115, 319 P.3d at 1123 (internal quotation marks omitted); see also Cordeiro, 99 Hawai'i at 424-25, 56 P.3d at 726-27; State v. Clark, 83 Hawai'i 289, 304, 926 P.2d 194, 209 (1996); State v. Marsh, 68 Haw. 659, 60-61, 728 P.2d 1301, 1302 (1986). Prosecutors may, however, cite to specific facts or evidence indicating the lack of trustworthiness of the witness or defendant when discussing a witness or defendant's testimony during summation. State v. Walsh, 125 Hawai'i 271, 295, 260 P.3d 350, 374 (2011) (stating that the "prosecution is free to refer to the specific inconsistencies and contradictions in a defendant's testimony or with other evidence"). A statement about a witness's credibility that is made without reference to the evidence or facts supporting the assertion amounts to an expression of personal opinion.[23] Basham, 132 Hawai'i at 118, 319 P.3d at 1126 (noting that the prosecutor's argument that the defendant had

_____

[23] It is noted, however, that a statement may improperly imply a personal opinion or special knowledge even if specific facts or evidence are invoked. See Am. Bar Ass'n, Criminal Justice Standards for the Prosecution Function, Standard 3-6.8(b) (4th ed. 2017) ("The prosecutor should not argue in terms of counsel's personal opinion, and should not imply special or secret knowledge of the truth or of witness credibility.").

"no reason to tell you the truth" was improper because it was not based on the evidence or a reasonable inference drawn from the evidence).

This principle is based on the rationale that expressions of personal opinion by the prosecutor are a form of unsworn, unchecked testimony and tend to exploit the influence of the prosecutor's office and undermine the objective detachment that should separate an attorney from the cause being argued.  Basham, 132 Hawaiʻi at 115, 319 P.3d at 1123.  Further, a personal opinion as to the veracity of a witness's testimony impermissibly usurps the jury's role as the assessor of witness credibility.  State v. Austin, 143 Hawaiʻi 18, 52, 422 P.3d 18, 52 (2018).  Conclusory opinions regarding a witness's credibility are inadmissible because the jury is fully capable of making the connections to the facts of the particular case before them and drawing inferences and conclusions therefrom. Id.

Salavea identifies the following statements as improper expressions of personal opinion as to the credibility of the CW:

> 1)   "[The CW] told you the truth."
>
> 2)   "[The CW]'s testimony was credible."
>
> 3)   "[The CW] told you and she was very frank with you[.]"

4)  "[The CW] was very forthright, she was very forthright about how she felt.  And she also told you frankly that they were close friends."

5)  "She was also very frank and forthright how she described what happened to her when she discovered things were missing."

6)  "[The CW] told you the truth."

Additionally, Salavea contends that statements such as the following were improper expressions of personal opinion as to Salavea's credibility:

1)  "Defendant's story that she had permission to go in and she had somehow thought it was okay and that [the CW] cooperated with her and [the CW] let her do all of that is not credible.  It's not credible, it's a lie because it doesn't make any sense."

2)  "[T]he whole story by Defendant that the fob was lost by [the CW] on March 6th does not hold, does not hold up.  That's a lie, and from there, it follows that she was concealing the fob, she was deliberately holding on to that fob secretly so she could go in her own time at her own convenience and take from [the CW]."

3)  "The records show that [the CW] got her replacement fob on June 27th.  That directly contradicts Defendant's story that [the CW] lost it in the car, and from there, everything crumbles, everything the Defendant tells you is not true."

4)  "It's a Burglary in the First Degree because Defendant, by lying about how the fob situation went up . . . went there specifically with an intent to commit the crime[.]"

5)  "Cari Salavea is not a truthful witness."

(Emphases added.)

Our review of the DPA's closing argument discloses that at least two of these statements bolstered the CW's

credibility without any reference to the evidence supporting the assertion.[24]  Similarly, the DPA attacked Salavea's credibility at least twice without prior reference to the evidence.[25]  The DPA also repeatedly asserted that Salavea had lied, a statement this court has found to be such a strong expression that it necessarily reflects the personal opinion of the speaker. Austin, 143 Hawai'i at 56, 422 P.3d at 56; see also Basham, 132 Hawai'i at 113, 319 P.3d at 1121 (citing Domingo-Gomez v. People, 125 P.3d 1043, 1050 (Colo. 2005)).  These assertions about the credibility of Salavea and the CW were not directly linked to

[24]    The first two statements, in which the DPA stated that the CW told the truth and her testimony was credible, were made at the beginning of closing argument before the DPA referenced any of the evidence adduced at trial.  Similarly, near the end of rebuttal, the DPA again asserted that the CW told the jury the truth without reference to the evidence.  This caused the court, for the fourth time, to sua sponte interject, "Well, the State submits."  The prosecutor then revised the statement: "The State submits she told you the truth."  The court then struck the statement and instructed the jury to disregard it.  These statements were clear expressions of the DPA's personal opinion because they did not reference the evidence supporting the assertion.  We do not address the propriety of the other statements Salavea identifies.  The dissent does not contest that the DPA failed to reference the evidence supporting these assertions but argues nonetheless that they were appropriate because they were "rooted in the context of evidence." Dissent at 43.  This explanation does not address the underlying misconduct of the DPA expressing an improper personal opinion.  Basham, 132 Hawai'i at 115-16, 319 P.3d at 1123-24.

[25]    The first statement that Salavea's version of the events was not credible and was a lie was made prior to any reference to the evidence from which this inference could be drawn.  Likewise in the fourth statement, the DPA asserted that Salavea had lied about how she got the CW's fob before referencing the relevant evidence.  In total, the DPA, without objection, stated Salavea lied or was lying three times during closing argument.  As with the statements regarding the CW, the DPA's statements about Salavea's credibility that were made without reference to the evidence amounted to expressions of the DPA's personal opinion.  We do not consider whether the DPA's other assertions about Salavea's credibility were appropriate.

the evidence and therefore amounted to expressions of personal opinion.[26]  Basham, 132 Hawai'i at 118, 319 P.3d at 1126; Walsh, 125 Hawai'i at 295, 260 P.3d at 374.

With respect to the DPA's use of the word "lie" during closing argument, the ICA observed this court's proscription in Austin of the use of the term "lie" and its derivatives during closing argument created a new rule that applied only on a prospective basis.  And therefore, the ICA concluded that it was not misconduct for the DPA to use the term "lie" at the time of Salavea's trial.  The dissent also appears to conclude that the DPA could not have committed misconduct by asserting that Salavea lied because Salavea's trial took place before our decision in Austin.  Dissent at 42.  While it is correct that our proscription of the word "lie" was prospective, it does not follow that it was appropriate to use the word "lie" at the time of Austin or Salavea's trial.  Indeed, in Austin, this court found that the prosecutor's use of the term "lie" during Austin's trial was improper under applicable precedent.  Austin, 143 Hawai'i at 51, 422 P.3d at 51 (citing Basham, 132 Hawai'i at 113, 319 P.3d at 1121; State v. Pacheco, 96 Hawai'i 83, 95, 26 P.3d 572, 584 (2001)).

---

[26]     The impropriety of the DPA's statements is underscored by the circuit court's multiple interjections during the DPA's closing argument.

Further, this court recognized that such assertions could amount to an expression of a prosecutor's personal opinion long before we proscribed the use of the word "lie" during closing argument. Marsh, 68 Haw. at 660-61, 728 P.2d at 1302-03. In Marsh, this court held that the prosecutor committed misconduct (1) by making the following assertions about the defendant's testimony: "Use your common sense, ladies and gentlemen. That is not true. It's another lie. It's a lie, ladies and gentlemen, an out-and-out lie"; and (2) by arguing as to the alibi witnesses' credibility: "You should entirely disregard their testimony because, if you will remember, every one of them lied on the stand[.]" Id. at 660, 728 P.2d at 1302. Although there was no objection to these assertions, the Marsh court, in light of these and similar statements, noticed plain error and vacated the conviction. Id.

In this case, the manner in which the DPA used the word "lie" implicitly expressed a personal opinion as to the veracity of Salavea's testimony, which has always been improper. Id. at 660-61, 728 P.2d at 1302-03. The mere fact that the DPA was not prohibited from using the term "lie" during closing argument does not mean that misconduct was not committed. The underlying impropriety of expressing a belief that a witness has lied clearly predates our decision in Austin. See Basham, 132

46

Hawai'i at 113, 319 P.3d at 1121; Clark, 83 Hawai'i at 304, 926

P.2d at 209; Marsh, 68 Haw. at 660-61, 728 P.2d at 1302-03.

Thus, the ICA erred in concluding that it was not misconduct for

the DPA to use the term "lie" during closing argument at the

time of trial in this case, and the dissent similarly errs in

reaching the same conclusion.  Austin, 143 Hawai'i at 51, 422

P.3d at 51; Basham, 132 Hawai'i at 113, 319 P.3d at 1121.

        The ICA also concluded that the circuit court "gave

numerous prompt curative instructions ('the State submits')."

First, only some of the improper statements received an

interjection from the court.  Second, the mere statement by the

court that "the State submits," and then the DPA repeating that

phrase as a preface is insufficient to rectify the improper

credibility opinion as the jury is not informed that the initial

statement is improper or that it should be disregarded.  Cf.

State v. Souza, 142 Hawai'i 390, 403-04, 420 P.3d 321, 334-35

(2018) ("A jury instruction must be specific to the harm

resulting from the error to function as a curative, and a

general, boilerplate instruction will not serve to eliminate the

prejudice." (citing Basham, 132 Hawai'i at 111, 319 P.3d at

1119)); State v. Espiritu, 117 Hawai'i 127, 143, 176 P.3d 885,

901 (2008) (stating that while the court did properly instruct

the jury on the elements of the defense, the instruction could

47

not cure the prosecutor's misstatement of the law "where no specific curative instruction relating to the misstatements was given"). Here, the only satisfactory curative instruction given during closing argument was the single instance that the court told the jury to disregard the DPA's stricken statement that the CW told the jury the truth. Thus, the ICA incorrectly concluded that numerous, prompt curative instructions remedied the DPA's improper statements. The dissent's conclusion is flawed for the same reasons.[27] See Dissent at 42.

### 2. Generic Attack on Credibility

Salavea also contends that the DPA committed misconduct during summation by implying that Salavea had lied during her testimony purely because she, as the defendant, had an interest in the outcome. Specifically, the DPA stated that "every Defendant has a lot of interest in the result of the case, and that's natural, but you cannot disregard it. It's

---

[27] Additionally, the ICA and the dissent reference the general instruction given to the jury that the statements or arguments made by lawyers are not evidence. Dissent at 43. However, this general instruction plainly did not rectify the improper statements of the DPA. As we have stated in a similar context, because "the instruction did not address the problematic nature of the prosecutor's statements" and it was "general in nature and was delivered to the jury along with a large number of other standard instructions before closing arguments began," it failed to serve as a curative measure for the misconduct. Underwood, 142 Hawaiʻi at 327-28, 418 P.3d at 668-69; see also Smith, 68 Haw. at 312, 712 P.2d at 501 ("Where . . . the success of the asserted defense hinged on defendant's credibility, we would be hard put to say instructions from the court probably had the desired curative effect[.]"); Walsh, 125 Hawaiʻi at 294, 260 P.3d at 373.

still there.  There is interest and bias.  Defendant has a lot of interest [in] what's at stake."

In Basham, this court held that "a prosecutor may not argue during closing argument that defendants, because they are defendants, have no reason to tell the truth or have the greatest motive to lie."  132 Hawai'i at 118, 319 P.3d at 1126 (internal quotation marks omitted).  In its review of the alleged misconduct in this case, the ICA held that Basham was not controlling because the Basham court cited to, but did not expressly overrule, State v. Apilando, 79 Hawai'i 128, 900 P.2d 135 (1995).[28]  In support of this conclusion, the ICA cited to State v. Magbulos, 141 Hawai'i 483, 413 P.3d 387 (App. 2018), stating that it had "recently attempted to reconcile this apparent inconsistency" and concluded that Basham did not overrule Apilando and should therefore be read narrowly.

However, in Austin, which predated the ICA decision in this case, this court had already addressed the "apparent inconsistency" between Basham and Apilando and declared our disapproval of the ICA's interpretation in Magbulos.  Austin, 43 Hawai'i at 56 n. 12, 422 P.3d at 56 n. 12.  This court

---

[28]     In Apilando, this court held that it was not improper for the prosecutor to argue during closing argument that the defendant had the highest stake in the outcome of the case and therefore had the greatest motive to lie.  79 Hawai'i at 142, 900 P.2d at 149.

specifically stated that our decision in Basham "overrules any prior precedents to the extent they are in conflict, and we express our disapproval of those portions of the Intermediate Court of Appeal's recent opinion in State v. Magbulos that misapprehend and mischaracterize our holding in Basham." Id. Thus, the ICA's reliance on Magbulos in its analysis of this allegation of prosecutorial misconduct did not follow our precedent. We therefore again reaffirm that it is improper for prosecutors to make "generic arguments regarding a defendant's credibility" during summation.[29] Id.

Looking to the "nature of the alleged misconduct," Rogan, 91 Hawai'i at 412, 984 P.2d at 1238, it is clear that the DPA's statement was improper. The DPA specifically referred to the interest that "every Defendant has . . . in the result of the case." (Emphasis added.) By generically referring to every defendant's interest in the outcome, the DPA attacked Salavea's

---

[29] In this case, the ICA also cited its conclusion in Magbulos that our holding in Basham was inconsistent with the Hawai'i Standard Jury Instructions Criminal (HAWJIC), which provide that the jury may consider a witness's interest in the result of the case when evaluating the weight and credibility of the witness's testimony. Our holding in Basham, however, does not preclude the prosecution from arguing that the evidence adduced at trial shows the defendant has a particularized, non-generic interest in the outcome that affects the credibility of the defendant's testimony. Basham simply prohibits the prosecution from making "generic arguments regarding a defendant's credibility," i.e., arguments that are uncoupled from evidence showing the defendant has a particular interest in the outcome separate from the generic interest shared by all defendants in criminal cases. Thus, contrary to the ICA's conclusion in this case and in Magbulos, Basham is not inconsistent with the standard HAWJIC.

credibility solely because of her status as a defendant.[30]

Basham, 132 Hawai'i at 117, 319 P.3d at 1125 ("[A] prosecutor cannot ask the jury to infer a defendant's lack of credibility based solely on the fact that he or she is a defendant."). Further, the DPA did not reference any evidence adduced at trial that could support an inference that Salavea had a particularized, non-generic interest in the outcome that affected her credibility. Walsh, 125 Hawai'i at 295, 260 P.3d at 374 (noting that a prosecutor may refer to specific inconsistencies and contradictions in a defendant's testimony or with other evidence). Thus, the ICA erred in concluding that it was not misconduct for the DPA to imply that Salavea lied simply because she was the defendant.

### 3. Denigration of Defense Counsel

Salavea also contends that the DPA committed misconduct during closing argument by personally attacking defense counsel and accusing counsel of attempting to manipulate the jury. We again look to the nature of the alleged misconduct to determine whether it was improper. Rogan, 91 Hawai'i at 412, 984 P.2d at 1238.

---

We note that in analyzing the generic nature of the DPA's closing argument, the dissent addresses only the problematic comment that Salavea had "a lot of interest [in] what's at stake" and not the entirety of the DPA's improper statement. Dissent at 45.

A prosecutor engages in misconduct by making comments during closing argument that impermissibly attack the integrity of defense counsel or that denigrate the legal profession in general. State v. Pasene, 144 Hawai'i 339, 370, 439 P.3d 864, 895 (2019); State v. Klinge, 92 Hawai'i 577, 595, 994 P.2d 509, 527 (2000). This court recently discussed the particular dangers posed by a prosecutor's attacks on defense counsel during closing argument in Underwood. 142 Hawai'i at 325–27, 418 P.3d at 666–68. We observed that such attacks are extremely problematic because "a jury is apt to attach undue weight to a prosecutor's disparagement of defense counsel." Id. at 327, 418 P.3d at 668. We further stated that accusations of this nature implicate the defendant's right to a fair trial "because it is a 'strik[e] at the appellant over the shoulders of his counsel in an attempt to prejudice the jury against the appellant.'"[31] Id. (alteration in original) (quoting Bell v. State, 614 S.W.2d 122, 123 (Tex. Crim. App. 1981)). Further, attacks on the personal character of defense counsel are improper because they denigrate

---

[31]    Similarly, a disparagement of the defendant that cannot be inferred from the evidence adduced may improperly prejudice the jury and implicate the defendant's right to a fair trial. Basham, 132 Hawai'i at 113, 319 P.3d at 1121 (noting that it was misconduct to argue that the defendant had lied to the police about being the driver of a vehicle because the defendant had not been charged with any misconduct regarding the vehicle and any evidence that he lied to the police would have been subject to Hawai'i Rules of Evidence Rule 404(b) as evidence of "other acts").

the legal profession--insinuating that defense counsel's zealous representation of a client amounts to unethical behavior--and undermine the adversarial system.  Id.  As such, disparagement of defense counsel during closing argument clearly constitutes prosecutorial misconduct.  Id.; Klinge, 92 Hawai'i at 595, 994 P.2d at 527.

During the defense's closing argument in this case, the DPA objected to defense counsel's statement that Salavea was in tears at one point during her testimony, contending it was not in evidence and it was a personal statement.[32]  The court overruled the objection.  Nonetheless, the DPA in rebuttal

---

[32]    The relevant portion of the defense's closing argument is as follows:

> [DEFENSE COUNSEL]: If I may leave you with a suggestion of evaluating the evidence in this case, it would be this. You recall that just before our lunch break, [Salavea] went on the witness stand, and the Deputy Prosecutor asked her whether she didn't take the Roxy bag without permission and whether that wasn't indeed theft, and [Salavea] broke down, she was in tears, and that's, I suggest--
>
> [DPA]: Objection, Your Honor.  This is not in evidence, and it's personal statement.
>
> THE COURT: Overruled.
>
> [DEFENSE COUNSEL]: And that's because it probably didn't even occur to her that that playful little act might be viewed by the law as a theft.  Now, the Government would have you believe that [Salavea], being that type of person, would take all of her friend's valuables, and it's just not borne out by the evidence.  Something occurred between these two women, but it wasn't a burglary.

(Emphasis added.)

stated that defense counsel had made an improper argument, asserting to the jury that "Defense Counsel was just . . . trying to appeal to your sense of pity . . . for Defendant, and that's improper."  The DPA's insinuation that defense counsel was trying to mislead the jury by making an improper appeal to the jury's sense of pity was clearly wrong as a lawyer may comment on a witness's appearance and demeanor during their testimony.[33]  The ICA concluded that this statement was proper because the DPA "simply reminded the jury about the Circuit Court's instruction in response to what could reasonably have been interpreted as defense counsel's attempt to have the jury take pity on Salavea."  The dissent agrees.  Dissent at 49. This conclusion does not recognize that the DPA did much more

_____

[33]     The dissent asserts that defense counsel in fact did commit misconduct by drawing the jury's attention to Salavea's demeanor, and thus it was perfectly appropriate for the DPA to accuse defense counsel of misconduct during rebuttal.  Dissent at 48-49.  The dissent also intimates that the circuit court erred in overruling the DPA's objection.  Dissent at 47-48. HAWJIC 3.09 (2014) provides in relevant part as follows: "In evaluating the weight and credibility of a witness's testimony, you may consider the witness's appearance and demeanor[ and] the witness's manner of testifying[.]" (Emphases added.)  Thus, defense counsel's comment on Salavea crying during her testimony clearly was not an improper appeal to the emotions of the jury.  Therefore, the court properly overruled the DPA's objection.
        More importantly, we reject the dissent's contention that misconduct by an attorney during closing argument grants opposing counsel license to accuse the attorney of misconduct on rebuttal.  Dissent at 48-49. The appropriate response to improper argument is an objection, and the disposition of an objection is within the discretion of the trial court, not counsel.  The DPA was not permitted to accuse defense counsel of misconduct simply because the DPA disagreed with the court's overruling of the objection, and the dissent's disagreement cannot retroactively sanction the DPA's improper conduct.

than remind the jury that its decision should not be influenced by pity for the defendant; the DPA told the jury that defense counsel had improperly attempted to influence the jury's decision by appealing to its sense of pity. This accusation was clearly incorrect, as the circuit court recognized when it properly overruled the prosecutor's objection.[34] We reaffirm that attacks on defense counsel, both express and implied, constitute prosecutorial misconduct.[35] Underwood, 142 Hawai'i at 327, 418 P.3d at 668; Klinge, 92 Hawai'i at 595, 994 P.2d at 527.

---

[34] The dissent suggests that the DPA's accusation of misconduct was justified because the attack aimed to undermine defense counsel's argument on "the primary issue at trial." Dissent at 48. Defense counsel's comment during closing argument was proper as ruled by the trial court. See supra note 33. Additionally, neither the DPA's tactical goals nor the criticality of the subject matter provides acceptable justification for the DPA's improper accusation that defense counsel committed misconduct, as our law makes plainly clear. Pasene, 144 Hawai'i at 370, 439 P.3d at 895; Underwood, 142 Hawai'i at 327, 418 P.3d at 668; Klinge, 92 Hawai'i at 595, 994 P.2d at 527.

[35] Salavea also contends that the following statement was an improper attempt by the prosecutor to shift the burden of proof to the defense:

> [W]hy would [the CW] go through all of this and why would [the CW] go and make up a story if it was not what happened? There was no evidence by Defendant why is it that [the CW] would do it, and there was no evidence from [the CW], even though we pushed her, both of us, that she had any reason to tell this story.

Read in isolation, the statement that there "was no evidence by Defendant why is it that [the CW] would do it" suggests that Salavea was obligated to adduce evidence that the CW's account was not credible. While the preceding and subsequent statements appear to indicate that the prosecutor was attempting to argue that nothing in Salavea's or the CW's testimony suggested that the CW's account was untruthful, the challenged statement improperly suggested that Salavea had the burden of showing why the CW's testimony was not credible.

In summary, we conclude that the DPA made several statements during closing argument that were improper. Because we have already determined that Salavea's conviction must be vacated, we need not consider whether the prosecutorial misconduct in this case would also warrant vacatur of the conviction. However, the multiple clear instances of prosecutorial misconduct during closing argument bolster our conclusion that the assistance of Salavea's trial counsel, when viewed as a whole, was ineffective. Defense counsel did not make a single objection to any of the DPA's improper statements during closing argument, which any competent defense attorney should have done. Smith, 68 Haw. at 312-13, 712 P.2d at 502 (noting that other instances of inadequate performance in the record bolstered the court's conclusion that trial counsel's assistance was ineffective). Additionally, despite several interjections by the court, the defense attorney still did not apprehend the improprieties in the DPA's closing argument and made no objections at all.[36] Clearly, counsel's failure to make objections and move to strike the various instances of

---

[36] This court has observed that in order to fulfill their duties as advocates and provide effective assistance, lawyers must ensure that their knowledge of relevant case law is up-to-date. Batalona v. State, 142 Hawai'i 84, 96, 414 P.3d 136, 148 (2018).

misconduct was not within the range of competence demanded of attorneys in criminal cases.[37]

## V.    CONCLUSION

Based on the foregoing, we vacate the ICA's Judgment on Appeal entered on July 9, 2019, and the circuit court's amended judgment.  The case is remanded to the circuit court for further proceedings consistent with this opinion.

| | |
|---|---|
| Randall H. Hironaka<br>for petitioner | /s/ Sabrina S. McKenna |
| | /s/ Richard W. Pollack |
| Sonja P. McCullen<br>for respondent | /s/ Michael D. Wilson |



---

[37]    Salavea also contends that the evidence adduced at trial was insufficient to support her conviction for burglary in the first degree. Specifically, Salavea argues there was not substantial evidence that she entered the CW's apartment unlawfully or that she had the intent to commit a crime therein at the time of her entry.  Although our conclusion that the ineffective assistance of defense counsel requires that Salavea's conviction be vacated, challenges to the sufficiency of the evidence must always be considered on appeal as "the [d]ouble [j]eopardy [c]lause bars retrial of a defendant once a reviewing court has found the evidence at trial to be legally insufficient to support a conviction." State v. Kalaola, 124 Hawaiʻi 43, 59, 237 P.3d 1109, 1125 (2010) (alterations in original) (quoting State v. Malufau, 80 Hawaiʻi 126, 132, 906 P.2d 612, 618 (1995)).  In considering Salavea's contention, the evidence is viewed in the light most favorable to the prosecution.  Id. at 46 n.2, 237 P.3d at 1112 n.2.  Upon review, we conclude that there was substantial evidence that Salavea intended to use the CW's misplaced fob to enter her apartment and take her property without permission.  Thus, there was sufficient evidence to support every material element of the offense that underlies Salavea's conviction.